UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAULA ANDRADE, | ) 1:04-cv-5485-SMS |
| | ) |
| Plaintiff, | ) DECISION AND ORDER ON SOCIAL |
| | ) SECURITY COMPLAINT (DOC. 1) |
| | ) |
| v. | ) ORDER DIRECTING REMAND PURSUANT |
| | ) TO SENTENCE FOUR of 42 U.S.C. § |
| JO ANNE B. BARNHART, | ) 405(g) |
| Commissioner of Social | ) |
| Security, | ) ORDER DIRECTING THE CLERK TO |
| | ) ENTER JUDGMENT FOR PLAINTIFF |
| Defendant. | ) PAULA ANDRADE AND AGAINST |
| | ) DEFENDANT JO ANNE B. BARNHART |
| | ) |

Plaintiff is represented by counsel and is proceeding in forma pauperis with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for a disability insurance benefits (DIB) and supplemental security income (SSI) benefits under Titles II and XVI of the Social Security Act (Act). Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the Magistrate Judge to conduct all proceedings in this matter, including ordering the entry of final

judgment.[1] The matter is currently before the Court on the

parties' briefs, which have been submitted without oral argument

to the Honorable Sandra M. Snyder, United States Magistrate

Judge.

<u>PRIOR PROCEEDINGS</u>

On July 24, 1998, Plaintiff an application for SSI benefits

under Title XVI of the Act and an application for DIB benefits

under Title II of the Act, respectively, alleging disability

beginning on June 13, 1998 due to rheumatoid arthritis. (A.R. at

53-58.) Plaintiff later alleged pain all over her body in March

2000 and weight loss and anemia in December 2000. (<u>Id.</u> at 212,

231-34.) Plaintiff's claim of disability based on rheumatoid

arthritis, hernia, gastro bypass, gall bladder, and general

complaints was denied initially and on reconsideration. (<u>Id.</u> at

194-97, 199-03.) Plaintiff requested a hearing. (A.R. at 204.)

On October 13, 1999, Plaintiff appeared with an attorney and

testified before the administrative law judge (ALJ), James E.

Ross. (A.R. at 690-713.) The ALJ denied Plaintiff's application

for benefits in a decision dated December 15, 1999. (<u>Id.</u> at 170-

77.) The Appeals Council ordered the case remanded for

development of additional medical evidence, hearing, and decision

by an order dated July 16, 2002. (<u>Id.</u> at 191-93.)

On November 12, 2002, Plaintiff appeared with an attorney

and testified before the administrative law judge (ALJ), James E.

Ross, at a second hearing. (<u>Id.</u> at 16, 664-89.) On February 21,

2003, the ALJ denied Plaintiff's application for benefits. (<u>Id.</u>

---

[1] The case was assigned to the undersigned Magistrate Judge by order of the District Judge dated August 11, 2004.

1  at 16-24.) Plaintiff appealed the ALJ's decision to the Appeals
2  Council, which denied Plaintiff's request for review on February
3  11, 2004. (Id. at 7-10.)

4  On March 25, 2004, Plaintiff filed the complaint in the
5  instant action. Defendant filed the administrative record on
6  August 3, 2004. On March 2, 2005, Plaintiff filed an opening
7  brief. On April 4, 2005, Defendant filed a brief in opposition.
8  On April 15, 2005, Plaintiff filed a reply brief.

9  ADMINISTRATIVE FINDINGS

10  The ALJ found that Plaintiff had a history of generalized
11  body aches and joint pain, rule out rheumatoid arthritis, status
12  post gastric bypass surgery for morbid obesity, acute
13  cholecystitis and umbilical and ventral hernias status post open
14  cholecystectomy and repair of hernias, and asthma; however, she
15  had no severe impairment or combination thereof. Plaintiff's
16  allegations of severe pain and limitations were found not to be
17  fully credible; Plaintiff had the residual functional capacity
18  (RFC) to perform work except for lifting/carrying more than ten
19  pounds frequently and twenty pounds occasionally, and from
20  exposure to excessive pulmonary irritants; Plaintiff's
21  limitations did not preclude performance of her past relevant
22  work as a cashier, and thus she was not disabled at any time
23  through the date of the decision.

24  ISSUES PRESENTED

25  Reference to the parties' briefs reveals that the following
26  issues are presented for determination:

27  1) Whether the ALJ gave adequate reasons, supported by
28  substantial evidence, for rejecting Plaintiff's subjective

3

complaints, including but not limited to Plaintiff's problems with her hands, bowel frequency, and attempts at unspecified treatment modalities;

2) Whether the ALJ failed to develop the record with respect to clarifying the treating doctor's opinion, gastrointestinal pathologies and limitations secondary thereto, unspecified consultative examinations, pedal edema and its effect on Plaintiff's ability to be on her feet, arthritis and its effect on Plaintiff's use of the hands, Plaintiff's need for and use of a walker, and obesity;

3) Whether the ALJ erred in failing expressly to make findings regarding various listings;

4) Whether substantial evidence and a statement of adequate reasons supported the ALJ's rejection of the opinion of Dr. Sablan, Plaintiff's treating physician;

5) Whether substantial evidence supported the ALJ's finding as to Plaintiff's RFC;

6) Whether the RFC included all of Plaintiff's impairments, including bowel frequency and incontinence, irritable bowel syndrome, arthritis, and polyarthralgia; and

7) Whether the conclusion that Plaintiff could perform her past relevant work (PRW) was supported by substantial evidence in view of the absence of testimony by a vocational expert (VE) regarding the nature and skills of her PRW.

<u>FACTS</u>

I. <u>Plaintiff's Testimony from the Hearings</u>

Plaintiff, who lived with her employed eighteen-year-old daughter, graduated from high school and received a degree as a

medical assistant. (A.R. at 693-94.)

Plaintiff was able to drive although finances prevented her from doing so. She was home alone during the day, prepared her own meals, helped clean the house, and made her bed; however, others did her laundry and grocery shopped. She had pain all over her body, in her joints, bones, muscles, and tendons. (A.R. at 699, 703, 706.) At the second hearing she testified that she was having a pain flare-up that caused her to walk slowly. (A.R. at 673.)

Plaintiff testified at the first hearing that three to four times a day she had to run to the bathroom and sometimes did not make it on time. (A.R. at 712.) At the second hearing she testified that since her gastric bypass surgery, she had to go to the bathroom six to eight times a day; about two or three weeks out of a month, or about half the time, she had to go about fourteen to fifteen times a day. (A.R. at 674-75.)

Plaintiff used a walker prescribed by Dr. Sablan at the time of her first hearing; at first she used it because of pain in her low back, but after her bypass surgery, she used it because she was weak and would fall and hurt herself. (A.R. at 704-05.) At the second hearing she testified that she received a walker about a month and a half before the hearing to use for balance when she went out walking or to a store. At the second hearing she was wearing two braces on her hands or wrists given to her on her last visit to Dr. Sablan. She wore them because her hands were weak, and she got numbing sensations and muscle spasms in her hands. (A.R. at 672-73.) She took them off two hours every day, at which time she would go to the store and then return to using

5

1  them. (A.R. at 687-88.)

2      At the first hearing she could walk a short distance to the

3  door in the hearing room but no farther because she would feel

4  weak and pain and she would feel as if she was going to fall.

5  (A.R. at 704-05, 707.) She could carry things only if she could

6  hold on to something to support her as she walked. She could not

7  carry something weighing less than ten pounds for even ten feet;

8  she could carry a five-pound item a short distance but not one

9  hundred feet. She could stand for about twenty-five minutes

10 before her legs would become numb and she would lose her balance

11 and be ready to fall. She could sit without moving for about

12 forty minutes, but she supported her upper body with her arms

13 because of pain in her lower back. She could sit and do simple,

14 light work with her hands for about half an hour only and then

15 she would feel numb in her back and would be able to stand up and

16 take a few steps. She could not sit, or stand and walk short

17 distances, for up to six hours out of an eight-hour day. (A.R. at

18 708-11.)

19     Plaintiff took Hydrocodone and Tylenol for pain; she took no

20 other arthritis medication. She took Methotrexate to strengthen

21 her bones.

22     At the first hearing, Plaintiff testified that she had

23 weight problems before her gastric bypass surgery in February

24 1999. (A.R. at 704.) At the second hearing, she testified that

25 the loss of weight caused her immune system to be too weak to

26 fight off infections. She had not seen any doctors in the past

27 two years for stomach problems. (A.R. at 677-78.)

28     At the second hearing, Plaintiff testified that her hernia

was fixed after a hysterectomy done with a hernia repair. (A.R. at 674.)

At the second hearing, Plaintiff testified that she still had anemia, which weakened her totally and prevented her from getting up from bed, getting dressed, or doing anything. When it got really cold, she would be stiff and could not get out of bed. (A.R. at 675-76.) Her hands were very stiff, and to use them she had to run hot water over them. (A.R. at 676.)

At the second hearing, Plaintiff testified that her hands were swollen, and the swelling had worsened in the past year and had prevented putting her rings on for about five or six months. She had swelling in her knees and ankles; edema was when her feet got all swollen and fat and felt as if they had water in them, whereas regular swelling resulted in their being just a little bit fat. When she would push her finger into edema-type swelling, it would turn yellow and was all watery inside. The edema-type swelling occurred when she was walking and standing up too much. (A.R. at 679-80.)

At the second hearing Plaintiff testified that she had been told to see a heart specialist because her arteries might be getting clogged, but she had not seen such a specialist. She had really bad chest pain on the left side, needle points on her heart and arm, and her left arm started hurting. That had started a month and one-half before the hearing. Before that, she had some skipping heart beats that she was told might be related to the muscle spasms and everything she had all over her body. She also testified that she started getting the chest pain when she could not breathe. (A.R. at 680-81, 685-86.)

7

1  Plaintiff had some places on her body that were extremely

2  tender to touch, such as her lower back; she had taken several

3  kinds of shots. (A.R. at 682.)

4  Plaintiff testified that about a year and one-half before

5  the hearing, she had been diagnosed with asthma. Her asthma was

6  worse, and she was using an inhaler that did not improve the

7  symptoms. She had to go to the hospital because of the attacks.

8  About three months before the hearing, Dr. Sablan had given her

9  treatment with a machine called a nebulizer for treatments at

10 home, but sometimes the treatments did not work. She had to take

11 the treatments every two weeks when she got to where she could

12 not breathe. She also took inhalers every two or three hours

13 every day. The symptoms worsened when she was exposed to things

14 outdoors such as pollen, dust, and mowing. (A.R. at 683-85.)

15 Plaintiff never worked as a medical assistant because she

16 was too sick; however, she worked for three years as a nursing

17 assistant at Beverly Manor until she hurt her back lifting a

18 patient, which resulted in a worker's compensation settlement.

19 She had worked at fast food restaurants as a cashier; in 1989 she

20 injured her arm in a fall at work, which resulted in a worker's

21 compensation settlement. (A.R. at 696-98.) She stopped working in

22 June 1998 because she began having bad pain and low back muscle

23 spasms from walking to and from work. Plaintiff believed it was

24 from rheumatoid arthritis, diagnosed by Dr. Sablan. (A.R. at 699-

25 700.)

26 Side-effects from Plaintiff's medications included loss of

27 hair, nausea, and weakness. (A.R. at 677.)

28 At the time of the second hearing, Plaintiff was not seeing

8

a doctor because she had no money and no MediCal coverage. (A.R. at 686-87.)

    II. <u>Plaintiff's Medical History</u>

       A. <u>Arthritis and Pain</u>

Notes from Bautista Medical Group from August 1997 reveal that Dr. J. Bautista opined that Plaintiff had arthritis with elevated sed rate; Prednisone and Naproxen were prescribed. There are no test results in the record; Dr. Bautista stated that Plaintiff might be referred to a rheumatologist. (A.R. at 88.) In September 1997, Dr. Bautista noted that Plaintiff complained that her arthralgias and myalgias were not relieved; the diagnosis was arthralgias and anxiety, and it was stated that she was referred to a rheumatologist. (A.R. at 85.)

On June 16, 1998, progress notes from the Sablan Medical Clinic reveal that Plaintiff complained of joint pains; examination showed she was tender at all lower extremity joints, knees were swollen and tender to palpation, and she had +1 edema bilaterally with unspecified varicosities. The impression was polyarthralgias, rule out rheumatoid arthritis (RA), obesity. Tests of RA, sed rate, and ANA were planned. Plaintiff was treated with medication. (A.R. at 138.) On June 16, 1998, Plaintiff's RA factor was within range, antinuclear antibody ANA screen was negative, and the result of the C-reactive protein (CRP test) is illegible. (A.R. at 130.) On June 26, 1998, she had lower back pain, difficulty going from sitting to standing, and reduced range of motion. On June 29, a walker had been recommended but was not yet available. (A.R. at 136-37.) X-rays in July 1998 were normal except for mild osteophytes; the

impression was rule out RA; a wheelchair was prescribed. (A.R. at 135.) On July 15, 1998, progress notes reflected that a lumbar myelogram and CT scan revealed a bulge at L4-5; RA was negative. (A.R. at 134.) On July 10, 1998, a myelogram and CT showed that the L4-5 bulging was mild with no encroachment on the thecal sac or nerve roots and no evidence of spinal or foraminal stenosis or disc herniation. There was low termination of the lumbar thecal sac but otherwise the test was negative. (A.R. at 126-27.) On July 20, 1998, she was feeling better; she walked slowly with a walker. (A.R. at 133.)

In August 1998 there was mild edema of the knees; arthritis was mentioned in a progress note, but its significance is unclear. (A.R. at 121.) On August 21, 1998, Dr. Talleyrand, a family practice specialist at the Sablan office, certified that Plaintiff was disabled and would be unable to perform her usual work until February 27, 1999, due to RA and anxiety/depression due to fatigue and inability to move without pain. (A.R. at 162.) In September and October 1998, a doctor certified that Plaintiff would be disabled until October 31, 1998, due to a RA flare and swollen hands and knees; however, she could engage in part-time classroom training and attendance at adult school, could care for her children, and was expected to be released from his care in a month. (A.R. at 160-61.)

On October 1, 1998, examination revealed swollen legs, painful movement in ankle and knee joints, and bilateral limited pulse in the dorsalis pedis and posterial tibia. However, there was no edema or swelling in any joints, although there was pedal edema +1. The diagnosis was rheumatoid arthritis, exacerbation,

and obesity. (A.R. at 116-19.) On November 11, 1998, the progress note reveals that RA sero was negative. (A.R. at 115.) Throughout this period, Plaintiff was given medication for pain.

Dr. Satish Sharma reported after an consultative internal medicine examination of Plaintiff on November 11, 1998, that Plaintiff's thoracic and lumbar spine and paraspinal areas were tender, pain was present on forward flexion at 50 degrees, straight leg raising was negative, and there were no muscle spasms. There was diffuse tenderness in all joints of all extremities. Despite Plaintiff's complaints of disabling pain and her reports of severe pain on range of motion testing in all joints of both upper extremities, there was no joint swelling or deformity, clubbing, cyanosis, edema, or ulceration; peripheral pulses were 2+. Range of motion could not be tested in any extremities. There was good motor tone bilaterally with good active motion, strength was within normal limits, sensation was grossly intact, reflexes were normal, but gait could not be tested because Plaintiff would not walk without a walker due to severe pain in the back and joints. Plaintiff could not do tandem gait, toe walking, or heel walking. The impression was that Plaintiff's tenderness and decrease in range of motion was probably secondary to pain. Dr. Sharma reported that although a note of a physician from Bautista Medical Group said that Plaintiff had arthritis with elevated sedimentation rate, and she had been put on low-dose Prednisone, 5 mg., one to two tablets daily, there were no reports about ANA, DNA, or rheumatoid factor titers. Dr. Sharma's impression was that it could be fibromyalgia syndrome or rheumatoid arthritis, which needed to be confirmed

with further lab testing. Dr. Sharma opined that Plaintiff could lift ten pounds frequently and twenty pounds occasionally, and she was limited in standing and walking. (A.R. at 91-94.)

Dr. Thomas W. Dunklin, a state medical consultant, completed a physical RFC assessment on November 24, 1998, regarding Plaintiff's joint pain. Dr. Dunklin noted that Plaintiff had alleged RA since 1991, but he concluded that if she had such gross limitation of movement as she subjectively alleged from RA, she should have some joint distortion, and she had none. The past records were adjudged too brief to assess the severity of her symptoms, but the consultative exam revealed no swelling or deformity, and muscle strength was estimated at 5/5. The impression was that Plaintiff had voluntary induction of movement restriction with no associated physical stigmata to support it. He recognized that Dr. Sharma was at a disadvantage in assessing the RFC due to Plaintiff's performance. He opined that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, sit, stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, and engage in unlimited pushing or pulling. There were no postural, manipulative, visual, communicative, or environmental limitations. (A.R. at 140-149.)

Progress notes from Sablan Medical Clinic dated December 7, 1998, show a continuing diagnosis of rheumatoid arthritis. (A.R. at 113.) In January 1999, a flare-up of RA was noted, and there was ½+ edema bilaterally; Plaintiff was given routine arthritis injections. (A.R. at 110.)

On February 27, 1999, Dr. Edward Holmes, a state medical consultant, reviewed the previous physical RFC as well as the

Plaintiff's subsequent cholecystectomy and hernia repair, severe hepatomegaly, and steatosis of the liver, and he agreed that a light RFC was appropriate on reconsideration because the subjective allegations were not consistent with the objective and were not well substantiated. (A.R. at 139.)

In March, April, and May 1999, Plaintiff reported worsening or continued joint pain to the Sablan Medical Clinic and sought and received an injection and medication for pain for RA. (A.R. at 153-56.)

In July and August 1999, Plaintiff's joint pain in her hands, wrists, and back continued, and she experienced a flare from the weather; she was given Vicodin at the Sablan Clinic for pain. (A.R. at 150-51.)

On November 24, 1999, Plaintiff's sedimentation rate was 22, which was high and beyond the reference range of 0 to 20. (A.R. at 261.)

On January 14, 2000, a doctor in Firebaugh stated that Plaintiff could perform no work and was permanently disabled. (A.R. at 380.)

On January 18, 2000, Dr. Sablan opined that Plaintiff was not precluded from full-time work, but since June 1998 she had been, and was, restricted to no more than sedentary work (lifting no more than ten pounds, sitting for six hours in an eight-hour work day, and standing/walking for two hours in an eight-hour day); she could lift ten pounds frequently and twenty pounds occasionally, sit four hours and stand/walk two hours, and had no manipulative limitations when she was well, but could not do any work when her joints and hands became swollen. She had difficulty

with her hands related to RA based on swelling and synovial thickening, reduced range of motion in all joints, elevated sed rates, positive RA titer, and elevated CRP. (A.R. at 239-40.)

On February 2, 2000, Plaintiff's sedimentation rate was 11, normal within the reference range of 0 to 20. (A.R. at 257.)

In March 2000, Dr. Sablan treated Plaintiff for rheumatoid arthritis and sinusitis. (A.R. at 392.)

On April 25, 2000, Dr. Ajit Khaira at Community Hospital reported that laboratory data collected on April 11, 2000, revealed rheumatoid factor of zero, ANA less than 1:40, and sed rate 19. (A.R. at 292.) She concluded that there was no evidence of rheumatoid arthritis. (A.R. at 293.)

On September 7, 2000, Dr. Steven Stoltz, a certified internal medicine specialist, performed a consultative internal medicine evaluation at the request of the Department. Plaintiff complained of back, ankle, knee, and foot pain as well as occasional muscle spasms in all extremities. She reported difficulty with lying down, sitting for prolonged periods, and pushing or pulling objects. Examination revealed paraspinal tenderness and spasm along the entire spine; forward flexion as limited to 40-45 degrees secondary to pain; and radicular signs evidenced by pain in the lower back with full knee extension while seated. Her forward flexion was only 40-45 degrees, but otherwise range of motion of her back was within normal limits. She had many trigger points, including the scapular region, elbow, knee, and thigh regions. Her range of motion of all extremities was within normal limits; her hand grip was normal, and finger approximation intact. Her pulses were normal. There

was good motor tone bilaterally with good active motion, strength
was 5/5 in all extremities, sensory was grossly intact, and
Romberg negative. Her reflexes were equal and normal. Her gait
was within normal limits. The diagnosis was arthralgias. Dr.
Stoltz opined that although Plaintiff claimed a history of
diagnosed rheumatoid arthritis for nine years and did have some
symptoms of possible inflammatory arthritis with early morning
stiffness, the exam revealed no evidence of current synovitis or
joint inflammation. Further, she was not on any typical
rheumatoid arthritis medication, such as Methotrexate,
Prednisone, or other disease-modifying agents. Dr. Stoltz opined
that she could lift and carry ten pounds frequently and twenty
pounds occasionally, stand and walk six hours out of an eight
hour work day with regular breaks, and sit without limitation.
(A.R. at 352-57.)

On October 24, 2000, Dr. Mitts, a state medical consultant,
opined that as a result of disorders of the back and hernia,
Plaintiff could lift and carry ten pounds frequently and twenty
pounds occasionally, stand and walk about six hours out of an
eight hour work day with regular breaks, sit about six hours, and
engage in unlimited pushing and pulling; she could frequently
climb, balance, kneel, and crawl, and only occasionally stoop and
crouch due to tenderness and muscle spasm along the spine. There
were no other limitations. He relied on the findings of Dr.
Stoltz and Plaintiff's subjective symptoms, which he found
credible as to condition but not as to severity. (A.R. at 358-
67.)

Progress notes from Dr. Khaira are illegible (A.R. at 369-

75.) However, reports of tests taken in November 2000 show a
sedimentation rate (ESR) of 22 mm/HR, with range being 0-20.
(A.R. at 377.)

Dr. James B. Peery reaffirmed on February 8, 2001, a light
RFC based on the September 2000 consultative report, with
additional limitations of occasional stooping and crouching due
to muscle spasm and tenderness. He concluded that the allegations
exceeded the medical evidence because of lack of synovitis, joint
inflammation, loss of range of motion, or loss of strength.
Further, there was no history of repeated transfusions for
anemia. (A.R. at 278-79.)

On November 30, 2001, Plaintiff complained to Dr. Sablan
about her pain. She informed him that she had been seen by a
different primary care physician, Dr. Ibarra, who told her to
stay off RA medications. The examination revealed swelling in the
extremities. The impression was anemia and arthritis of uncertain
type, it being noted that the RF (rheumatoid factor) was negative
before; the plan included x-rays of the hands and tests for
arthritis; the notes are partially illegible, but seronegative RA
was mentioned in the plan as needing confirmation through a
rheumatologist. (A.R. at 390-91.)

On November 30, 2001, Dr. Christian L. Dineson in Firebaugh
stated that Plaintiff was incapacitated from any work or training
since March 3, 2000, because of degenerative arthritis with poor
ability to perform manual tasks; the treatment plan was steroids,
NSAIDS, and Methotrexate. He expected the condition to be
permanent. He stated that she was under work-up of her arthritic
condition and additionally had anemia which rendered her

extremely weak and dizzy with poor ability to concentrate. (A.R. at 381-82.)

On December 21, 2001, notes from the Sablan office revealed a diagnosis of bronchitis and arthritis, probably seronegative. No further test results were noted. (A.R. at 390.)

Again on January or February 18, 2002, progress notes from the Sablan office indicate an equivocal diagnosis of bronchitis and "Arthritis (seronegative RA??)." (A.R. at 389.)

Plaintiff was admitted to Community Medical Center (CMC) from March 18 through 25, 2002, for fever, chills, and back pain. The diagnosis was acute pyelonephritis with urosepsis based on urinalysis positive for infection, with a CAT scan showing mild post obstructive dilatation of left upper collecting system and small, nonobstructing calculus (stone) in the right distal ureter at the UV junction. A renal ultrasound was negative. Antibiotics were prescribed. (A.R. at 463, 473, 477-78.)

On April 25, 2002, Plaintiff sought pain medication for leg cramps at the Sablan clinic; the diagnosis was RA and muscle strain; the plan was to consult with Dr. Sablan and to continue medications. (A.R. at 387.)

On May 20, 2002, Plaintiff visited the emergency room for insomnia for three days, facial numbness, stress, fatigue, and generalized weakness; she had been evicted from her apartment. She complained of headache, chest pain, and palpitations. She was alert, in no acute distress, and depressed. The physical exam was normal, and the impression was multiple somatic complaints, psycho-social stress, and insomnia. (A.R. at 432-49.)

On July 2, 2002, Plaintiff appeared for a physical. Dr.

Sablan diagnosed rheumatoid arthritis and anemia as well as status post gastric bypass. Medications were continued. (A.R. at 385.) On July 29, 2002, Plaintiff complained of swollen hands and feet; the diagnosis was polyarthralgia with a history of RA, and anemia. (A.R. at 384.)

Records of the Sablan offices indicate that on July 2, 2002, Plaintiff's creatinine serum was 1.2, within range, which was 0.5-1.5; none of the levels reported were out of range except in the CBC. (A.R. at 395.)

Records of the Sablan offices indicate that on July 29 and 30, 2002, a rheumatoid profile B revealed the following: uric acid, serum, in range, 4.6; rheumatoid factor (RF), negative; C-reactive protein, QNT, negative; anti-streptolysin O (ASO) negative; anti-nuclear AB (ANA) ANA (EIA), negative; creatine kinase (CK) was high at 211, the reference being 26-140; and the sedimentation rate (ESR) was 20, within range of 0-20. (A.R. at 393-94.)

On September 26, 2002, Dr. Sablan filled out a questionnaire that listed Plaintiff's primary impairments as low back pain, degenerative joint disease in the knees and ankle, and myositis. The objective findings on which this was based were CT myelogram 1998 Advance Med (followed by an illegible word), + bulge L4-5, and CPK of July 2002. She could sit ten minutes, stand ten minutes, and walk ten to fifteen minutes; she could sit a total of three hours and stand and/or walk for a total of four hours in an eight-hour period; she had to lie down and elevate her legs one hour in an eight-hour day; her weight limit was five pounds. She had been in her disabled condition for eight months. (A.R. at

383.)

In October 2002, a hospital note reflects that Plaintiff ambulated without assistance with no edema, deformity, or pain. (A.R. at 406-07.)

On February 10, 2003, Dr. Sablan completed a form for the Health Human Services Agency of the state of California regarding Plaintiff's ability to participate in a CalWORKS activity. He opined that Plaintiff could sit, stand and walk two hours at a time for a total of four hours a day; bilateral carpal tunnel syndome (CTS) restricted use of hands and fingers for repetitive motion; she was restricted in using her feet for repetitive movements after two hours; restricted from heights because of poor balance; and due to carpal tunnel syndrome, she could not lift any weights ten pounds or over. She could never couch or crawl, only occasionally climb, stoop, kneel, or reach, except that she could frequently reach from waist to chest and chest to shoulders, and balance. Her pain medications had an unspecified effect on her ability to work. She also suffered depression. The diagnoses were polyarthritis and bilateral carpal tunnel syndrome. (A.R. at 660-63.)

On July 8, 2003, Dr. Sablan certified that Plaintiff suffered painful, swollen joints that prevented her from working, climbing, repetitive bending, lifting, or hand movements, lifting more than twenty pounds at one time, and standing or walking fifteen minutes or more an hour; further, she could have only limited interaction with the public. The diagnoses (one of which was illegible) were RA, major depression, PLBP, and asthma, with onset in 1998, and permanent duration. (A.R. at 658-59.)

1          B. <u>Gastric Complaints</u>

2          On November 22, 1998, Plaintiff underwent a laparoscopic

3  cholecystectomy after four days of pain in the right quadrant.

4  (A.R. at 97-98.) Dr. Herbert E. Gladen, the surgeon, reported

5  that Plaintiff also had a supraumbilical hernia and a ventral

6  hernia at the infraumbilical previous trocar site that were

7  repaired. (A.R. at 97, 99.) There were no complications. (A.R. at

8  241.) Dr. Paul H. Atmajian, a pathologist, performed analysis

9  after the cholecystectomy of the gallbladder on November 24,

10  1998, and found chronic colecystitis with colelithiasis and acute

11  congestion, as well as marked macrovesicular steatosis of the

12  liver, but both were negative for inflammation and malignancy.

13  (A.R. at 106-07.) On January 18, 1999, Dr. Herbert Gladen of

14  University Medical Center (UMC) opined that Plaintiff, who

15  weighed 241 pounds and was 61 inches in height, was morbidly

16  obese despite having reduced from her peak weight of 350 pounds.

17  He recommended Roux-en-Y gastric bypass. (A.R. at 165-66.)

18          The bypass surgery was performed on February 13, 1999. (A.R.

19  at 253.) There was a wound abscess detected on March 25, 1999,

20  but by April 8, 1999, it was healing well. (A.R. at 315-18.)

21  Plaintiff reported vomiting only certain foods by April 26, 1999.

22  (A.R. at 315.) In July 1999, she complained that her diarrhea was

23  getting worse. (A.R. at 314.)

24          On January 6, 2000, Plaintiff was treated at the emergency

25  room at CMC, where Dr. Bradley Barth opined that she suffered an

26  incarcerated hernia at an old incision site. Dr. Gladen performed

27  an emergent repair of an incarcerated ventral hernia. (A.R. at

28  245-48.)

When queried on January 18, 2000, regarding Plaintiff's representation that since her February 1999 surgery, she had bowel frequency of ten bowel movements per day, had to wear padding, and had daily accidents, and when specifically asked if it was consistent with her representations to him, her condition, and her examinations, Dr. Sablan replied that she had had gastric bypass with secondary change in her bowel habits consistent with complications expected with this surgery. He also noted that stool incontinence due to expected frequency of bowel movements were additional work limitations; she needed to be near a bathroom all day if she was to work. (A.R. at 239-40.)

On April 25, 2000, Dr. Ram Mittal reported that Plaintiff in turn had reported upper abdominal pain, nausea, and vomiting after meals for a month and one-half. He opined that it was necessary to rule out ulcers, neoplasm, and colonic pathology. (A.R. at 295-97.) Dr. Mittal reported that endoscopy revealed moderate gastritis but was otherwise unremarkable; a colonoscopy revealed that Plaintiff had a significant ascending colon polyp, with no evidence of a tumor, which was snared without complications; and she had a few diverticula in the right colon with no evidence of a tumor, angiodyplasia, or colitis. She had iron deficiency anemia. Histopathology reports were to be followed, and Plaintiff was to consume a high fiber diet. (A.R. at 289-90.)

On April 25, 2000, Dr. Ajit Khaira at Community Hospital reported that Plaintiff denied any history of diarrhea or leg swelling. (A.R. at 292.)

On May 12, 2000, Dr. Khaira reported that a gastric biopsy

1 reflected moderate chronic active gastritis. The diagnosis was

2 Helicobacter pylori gastritis, status post polypectomy with

3 villoglandular polyp, diverticulosis colon, status post gastric

4 by pass surgery and cholecystectomy. There was no evidence of

5 malignancy. (A.R. at 282-83.)

6     On September 7, 2000, Plaintiff reported to Dr. Stoltz that

7 she had no history of diarrhea. (A.R. at 353.) She related "some

8 mild bowel and bladder incontinence" but denied radiculopathy or

9 numbness in her lower extremities. (Id. at 352.)

10     On April 5 through 7, 2001, Plaintiff was hospitalized at

11 CMC for complaints of sudden onset of diarrhea, vomiting, and

12 abdominal pain. X-rays revealed nonspecific bowel gas pattern

13 without evidence of free air or obstruction. The diagnosis was

14 probable gastroenteritis, hypokalemia, and anemia. Her potassium

15 was repleted in the hospital. She was discharged with

16 instructions to eat lightly for a few days and to follow up with

17 iron supplementation. (A.R. at 570-87.)

18     Plaintiff was hospitalized on May 13 through 19, 2001, at

19 CMC. (A.R. at 520-69.) She complained upon admission of abdominal

20 pain beginning the day before; she related that she had

21 experienced nausea and diarrhea but no vomiting. The pain was

22 similar to that experienced in early April 2001. There was

23 tenderness in the epigastric area but not otherwise; bowel sounds

24 were normal. She required Demerol IV for pain but examination

25 revealed no surgical abdomen. (Id. at 565-67.) Plaintiff reported

26 that the pain had started after her hysterectomy in August 2000.

27 (A.R. at 530.) Dr. Gladen reported that a repeat upper GI

28 endoscopy was negative. A CT scan showed some deformity of the

hepatic flexure of the colon. (A.R. at 556.) Dr. Behzad Noorbehesht opined that an x-ray of the small bowel revealed status post gastric bypass; no evidence of obstruction or anastomotic leak; and unremarkable small bowel. (A.R. at 533.) Dr. Mittal reported that a specimen revealed polypoid mucosa in the gastric remnant; his final diagnosis was moderate chronic gastritis, no evidence of dysplasia or malignancy, and numerous Helicobacter-like organisms confirmed on the Giemsa stain. (A.R. at 552.) Dr. Gladen opined by exclusion, the only diagnosis left was peptic disease, for which she was being treated. Her pain lessened by the time of discharge. She was given pain medication and Prevacid 30 mg. twice a day, and was instructed to seek followup with Dr. Mittal regarding peptic disease. Dr. Gladen did not think she had surgical disease. (A.R. at 556.)

On October 14, 2001, Plaintiff visited the emergency room at CMC for epigastric pain, nausea, and vomiting with dizziness that increased with eating. Medication relieved her pain and nausea. The impression as acute abdominal pain. (A.R. at 500-07.)

On March 18 and in June 2002, Plaintiff denied nausea, diarrhea, or vomiting; and on September 24 and in June, 2002, she did not complain of abdominal pain or incontinence. (A.R. at 476, 420.)                    C. Cardiovascular Complaints

In January 1999, Dr. Gladen observed pitting edema at 2+ at the ankles. (A.R. at 165.)

On February 9, 1999, chest x-rays revealed normal cardiomediastinal silhouette and no evidence of vascular congestion; the lungs were clear. There was no evidence of acute cardiopulmonary disease. (A.R. at 336.)

23

On February 13, 1999, Dr. Gladen's preoperative report revealed 2+ pitting edema at the ankles. (A.R. at 333.) On February 22, 1999, following gastric bypass surgery, progress notes at Community Health System reveal edema of the ankles at 3+. (A.R. at 254.) On July 26, 1999, Plaintiff reported no ankle swelling on Lasix. (A.R. at 314.)

On October 29, 1999, Plaintiff visited the emergency room at CMC for coughing, sinus pressure, mild trouble breathing, and chest pain on inspiration, which resolved in several hours. Her lungs were clear, and she was in no obvious respiratory distress She had no nausea. The impression was acute viral bronchitis. There was no evidence of acute cardiopulmonary disease on a chest x-ray. (A.R. at 309-13.)

On November 14, 1999, Plaintiff again visited the emergency room at CMC complaining of cough and shortness of breath. Her lungs were clear, and she was in no acute distress; breath sounds were normal, and there were no cardiovascular abnormalities. The impression was prolonged upper respiratory infection, COPD and acute bronchitis and tracheitis. (jA.R. at 303-07.)

On January 18, 2000, Dr. Sablan reported that Plaintiff had pedal edema with venous insufficiency (varicosities) that caused her to have to elevate her legs four times in an eight-hour day. (A.R. at 239-40.)

Plaintiff was admitted to CMC on April 25, 2000, for chest pain. A chest x-ray was negative. Fresno Community Hospital laboratory reports of cardiac panels taken on in April 2005 from the Department of Pathology indicated an interpretation that aside from a couple of inconclusive results, there had been no

acute myocardial infarction (AMI) or mycardial injury, and AMI was ruled out. (A.R. at 341, 344.) Dr. Ram L. Mittal confirmed that the panels were negative for acute myocardial infarction. (A.R. at 295-97.) Dr. Ajit Khaira noted that Plaintiff had been found to have some hypotensive and bradycardic episode, and a history of nausea and vomiting, more nausea than vomiting. An EKG showed sinus bradycardia but otherwise was within normal limits. (A.R. at 291-93.) Plaintiff denied any history of leg swelling. (A.R. at 292.) Examination revealed no pretibial or pedal edema. (Id. at 293.) Dr. Khaira diagnosed chest pain, rule out unstable angina, rule out MI, rule out ischemic heart disease; sinus bradycardia, rule out hypothyroidism and other medication effects. (A.R. at 293.)

On May 12, 2000, Dr. Khaira reported that a cardiac panel revealed no ischemia or functional abnormality; the discharge diagnosis was left side chest pain, noncardiac; acute myocardial infarction ruled out. (A.R. at 282-83; 279-80.)

In September 2000, Plaintiff denied any history of chest pain to Dr. Stoltz. (A.R. at 353.)

In April and May 2001, chest x-rays revealed no active pulmonary disease. (A.R. at 536, 579.) No edema was observed on May 13, 2001. (A.R. at 566.)

On November 30, 2001, and January 18, 2002, examination at the Sablan ofice showed no swelling in the extremities. (A.R. at 390, 389.)

On March 18, May 20, and June 29, 2002, when Plaintiff was examined in the emergency room, there was no edema in the extremities or pedal edema. (A.R. at 477, 437, 428.)

On September 24, 2002, Plaintiff visited the emergency room at CMC for sudden onset of shortness of breath with chest pain, increasing on respiration and movement; she hyperventilated when attended to, but calmed down; there was no wheezing, lungs were clear, and there was good air entry. She complained of a pressing, sharp, stabbing pain of mild to moderate severity when she was seen in the middle of her chest with no radiation, with associated nausea. She was put on a cardiac monitor. The diagnosis was acute chest wall pain. She initially refused to leave and was inconsolable. She was discharged with instructions to obtain a stress test from Dr. Hanks that day. A chest x-ray taken September 25 revealed clear lungs, heart not enlarged, no adenopathy or effusion; the impression was no acute findings. (A.R. at 409-420.)

D. Asthma

Plaintiff's chest was clear, without rales, rhonchi or wheezing when she was examined on April 25, 2000, at Community Hospital for chest pain and nausea. (A.R. at 293.)

Plaintiff visited the CMC emergency room on June 25, 2000, for shortness of breath, sore throat, muscle aches over her whole body, and anxiety. The impression was acute laryngitis. She exhibited no respiratory distress, and her breath sounds were normal. (A.R. at 270-73.)

When at the hospital for an unrelated matter, Plaintiff denied asthma or shortness of breath on May 13, 2001. (a.R. at 566.)

On September 21, 2001, Plaintiff visited the CMC emergency room for fever, cough, and congestion that she had suffered for a

week and one-half. She reported mild trouble breathing.
Examination revealed she was in no respiratory distress, and her
breath sounds were normal. The clinical impression was acute
sinusitis. She was given Dristan or Afrin nasal spray and an
Albuterol inhaler and taught to use an inhaler and spacer. (A.R.
at 514-19.)

On February 26, 2002, Plaintiff visited the emergency room
at CMC complaining of fever and chest pain when breathing, cough,
shortness of breath, and chills. Examination revealed mild
trouble breathing; she was not in respiratory distress, but there
was decreased air movement and occasional wheezing. The clinical
impression was influenza exacerbating asthma. Plaintiff was given
Atrovent and Albuterol; she was limited for one week to semi-
sedentary work with limited exertion. (A.R. at 498.)

Progress notes from Sablan indicate that on March 7, 2002,
Plaintiff complained of shortness of breath and difficulty
breathing. It had begun with a cold and congestion; she had gone
to an urgent care clinic. Medications were prescribed.
Substantial portions of the notes are illegible. (A.R. at 389.)

On April 1, 2002, Plaintiff visited the emergency room at
CMC for progressive shortness of breath that she had experienced
for two days; she had used her inhaler at home but was
hyperventilating upon admission. She was found to be anxious but
in mild distress. She reported pain on inspiration, and cough.
Lung sounds were normal. (A.R. at 443, 446.) She reported her
medications as including Albuterol, Combivent, Vicodin,
Singulair, and Allvair. (A.R. at 443.)

On April 3, 2002, Plaintiff visited Sablan office after

having gone to Fresno Community for an asthma attack on April 1, 2002, where the triage nurse told her to sees her primary care doctor. Plaintiff experienced shaking from the nebulizer that she was using. The diagnosis was bronchitis; medications were prescribed, including Advair, Vanceril, Singulair, and a nebulizer. (A.R. at 388.)

On June 29, 2002, Plaintiff visited the emergency room at CMC for complaints of bronchial asthma and shortness of breath that she had suffered for a day, cough, and chest pain on inspiration. (A.R. at 421-31.) She was in no respiratory distress, breath sounds were clear to auscultation, she had slight trouble breathing, and there was wheezing and chest tightness; she also suffered a sore throat, congestion, and chills and muscle aches. The clinical impression was acute viral syndrome. (Id. at 425.)

On October 23, 2002, Plaintiff was taken to the emergency room at CMC, appearing to be in very mild distress and hyperventilating. Upon arrival she complained of an asthma attack, feeling tired and weak, and upper chest pain. It had lasted fifteen minutes before admission. (A.R. at 398-409.) Her only reported medications were Albuterol and Prednisone. (A.R. at 398, 401.) She was breathing rapidly and was encouraged to breathe slowly. She reported wheezing and moderate trouble breathing with chest tightness and pain; she had body aches. She was very teary because she felt that she had been mistreated by staff. Her shortness of breath improved but she then felt sore all over and requested Vicodin for pain, which her doctor had taken her off. She reported a history of occasional asthma

attacks. Upon examination she was in no respiratory distress, and her breathing sounds were normal. Her peak flow was 530. After several hours she was released with medication. The diagnosis was acute exacerbation of asthma and rheumatoid arthritis. (A.R. at 402.)

### E. Hernias

Dr. Herbert E. Gladen, the surgeon who operated on November 22, 1998, opined that Plaintiff also had a supraumbilical hernia and a ventral hernia at the infraumbilical previous trocar site that were repaired, and she had hepatomegaly with severe steatosis. (A.R. at 97, 99.)

In January 2000, Plaintiff had surgery to repair a ventral hernia with no complications; she was discharged without restrictions. (A.R. at 241-42.)

### F. Obesity

Dr. Satish Sharma reported after an consultative internal medicine examination of Plaintiff on November 11, 1998, that Plaintiff was obese. (A.R. at 92.) Dr. Herbert E. Gladen opined that Plaintiff was morbidly obese on November 22, 1998, and January 1999. (A.R. at 104, 165.) After Plaintiff's surgery in February 1999, she lost sixty-one pounds and was down to 186 on July 26, 1999. (A.R. at 314.) In September 2000, she weighed 127 pounds. (A.R. at 354.)

### G. Anemia

On April 25, 2000, Dr. Ram M. Mittal at CMC reported that Plaintiff had iron deficiency anemia with hemoglobin or 8.9 and MCV 74, percent saturation of iron was 7 percent, and serum iron was 20. After ruling out upper gastrointestinal or lower

gastrointestinal bleeding, (A.R. at 293), Plaintiff was to be treated with iron supplements and her CBC to be monitored as an outpatient, (A.R. at 290). Dr. Khaira opined that Plaintiff's generalized aches and neck pain were probably related to anemia. (A.R. at 293.)

On May 17, 2000, Plaintiff underwent a dilation and curettage for blood loss anemia due to a fibroid uterus, septated ovarian cyst, and fluid collection. (A.R. at 263, 274-75.)

In July 2000 she was treated at FCH outpatient for anemia. (A.R. at 269.) In August 2000 she underwent an abdominal hysterectomy for pelvic pain and menometrorrhagia. (A.R. at 263-68, 607.)

In September 2000, she denied any history of anemia or unexplained bleeding to Dr. Stoltz. (A.R. at 354.)

On April 6 and 10, 2001, Plaintiff's hemoglobin was low (9.6 to 11.1), HCT was low (36.3 to 32.4), and MCH was low (23.2). (A.R. at 637, 641.) These measures were low again on May 13, 14, and 19, 2001. (A.R. at 625, 632.)

On July 2, 2002, tests ordered by Dr. Sablan indicated that the following aspects of the CBC were out of range: hemoglobin low, 11.3 (range 12.0-16.0); hematocrit low, 35.4 (range 36.0-48.2); and MCH low, 26.4 (range 27.0-34.0). (A.R. at 395.) The levels had risen to 11.6, 35.7, and 26.9, respectively, by July 30, 2002, although they were still technically within the low range. (A.R. at 393.)

<u>SCOPE AND STANDARD OF REVIEW</u>

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In

reviewing findings of fact with respect to such determinations,
the Court must determine whether the decision of the Commissioner
is supported by substantial evidence. 42 U.S.C. § 405(g).
Substantial evidence means "more than a mere scintilla,"
Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a
preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10
(9th Cir. 1975). It is "such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion."
Richardson, 402 U.S. at 401. The Court must consider the record
as a whole, weighing both the evidence that supports and the
evidence that detracts from the Commissioner's conclusion; it may
not simply isolate a portion of evidence that supports the
decision. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).
It is immaterial that the evidence would support a finding
contrary to that reached by the Commissioner; the determination
of the Commissioner as to a factual matter will stand if
supported by substantial evidence because it is the
Commissioner's job, and not the Court's, to resolve conflicts in
the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th
Cir. 1975).

     In weighing the evidence and making findings, the
Commissioner must apply the proper legal standards. Burkhart v.
Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must
review the whole record and uphold the Commissioner's
determination that the claimant is not disabled if the Secretary
applied the proper legal standards, and if the Commissioner's
findings are supported by substantial evidence. See, Sanchez v.
Secretary of Health and Human Services, 812 F.2d 509, 510 (9th

Cir. 1987); <u>Jones v. Heckler</u>, 760 F.2d at 995. If the Court

concludes that the ALJ did not use the proper legal standard, the

matter will be remanded to permit application of the appropriate

standard. <u>Cooper v. Bowen</u>, 885 F.2d 557, 561 (9th Cir. 1987).

ANALYSIS

I. <u>Disability</u>

In order to qualify for benefits, a claimant must establish

that she is unable to engage in substantial gainful activity due

to a medically determinable physical or mental impairment which

has lasted or can be expected to last for a continuous period of

not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A).

A claimant must demonstrate a physical or mental impairment of

such severity that the claimant is not only unable to do the

claimant's previous work, but cannot, considering age, education,

and work experience, engage in any other kind of substantial

gainful work which exists in the national economy. 42 U.S.C.

1382c(a)(3)(B); <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1456 (9th

Cir. 1989). The burden of establishing a disability is initially

on the claimant, who must prove that the claimant is unable to

return to his or her former type of work; the burden then shifts

to the Commissioner to identify other jobs that the claimant is

capable of performing considering the claimant's residual

functional capacity, as well as her age, education and last

fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d

1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific

sequential determinations in the process of evaluating a

disability: 1) whether the applicant engaged in substantial

32

gainful activity since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520 (1997);[2] 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

With respect to SSI, the five-step evaluation process is essentially the same. See 20 C.F.R. § 416.920.

II. Rejection of Plaintiff's Subjective Complaints

Plaintiff contends that the ALJ did not fully and fairly review the testimony. Plaintiff asserts that the ALJ did not recite all of Plaintiff's complaints and ignored her testimony, and "[m]uch of it was mistated." The Court notes that Plaintiff does not set forth any specific subjective complaint that was allegedly ignored, and she does not indicate what portion of Plaintiff's testimony was allegedly misstated. The Court will not

---

[2] All references are to the 1998 version of the Code of Federal Regulations unless otherwise noted.

guess at what Plaintiff's arguments are; rather, the Court will
review the sufficiency of the ALJ's opinion in light of the
pertinent legal standards.

Plaintiff states that the only reasons given to reject
Plaintiff's testimony were test results of sedimentation rates,
whereas some of the testing supported Plaintiff; the consulting
examiners' reports, which Plaintiff asserts were insufficient
evidence because they did not support the ALJ's RFC; and
objective signs, which were insufficient. Because Plaintiff made
many consistent assertions regarding her hands, bowel frequency,
and unspecified treatment modalities attempted, rejection of her
credibility was unsupported.

Assessment of the sufficiency of the evidence to support the
ALJ's RFC is set forth separately below.

It is established that in order to reject a claimant's
subjective complaints, the ALJ must provide specific, cogent
reasons for the disbelief. Lester v. Chater, 81 F.3d 821, 834
(9th Cir. 1995). Once the claimant introduces medical evidence of
an underlying impairment that could reasonably be expected to
produce some degree of the subjective symptoms, the Commissioner
may not discredit the claimant's testimony as to subjective
symptoms merely because they are unsupported by objective
evidence such as objective medical findings. Id.; Smolen v.
Chater, 80 F.3d 1273, 1282 (9th Cir. 1996). Unless there is
affirmative evidence tending to show that the claimant is
malingering, the reasons for rejecting the claimant's testimony
must be clear and convincing, and the ALJ must set forth the
rejection by identifying what testimony is not credible and what

evidence undermines the claimant's complaints. <u>Lester v. Chater</u>, 81 F.3d at 834. The findings of the adjudicator must be properly supported by the record and must be sufficiently specific to allow a reviewing court to conclude that the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony. <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345-46; <u>Byrnes v. Shalala</u>, 60 F.3d at 641-42 (9th Cir. 1995); <u>see</u> 20 C.F.R. § 404.1529(c) [disability] and 20 C.F.R. § 416.929(c) [supplemental security income].

Social Security Ruling 96-7p directs the adjudicator to consider not only objective medical evidence of signs, laboratory findings, and medical opinions, but also the following factors when assessing the credibility of an individual's statements:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and adverse side effects of any medication for pain or other symptoms;
> 5. Treatment, other than medication, for relief of pain or other symptoms;
> 6. Any measures other than treatment used by the individual to relieve the pain or other symptoms; and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

<u>See also</u> <u>Bunnell v. Sullivan</u>, 947 F.2d at 346.

Here, the ALJ relied on many factors in rejecting Plaintiff's subjective claims of disabling symptoms. In various parts of the decision, the ALJ noted Plaintiff's subjective allegations as reported to medical sources, including disability from rheumatoid arthritis, body aches and joint pain, abdominal pain (A.R. at 17, 19), chronic low back pain with slowness and

1  difficulty walking, chest pain (A.R. at 18, 19), spinal

2  tenderness and spasm (A.R. at 19), gross limitation of movement,

3  early morning stiffness (A.R. at 20), bowel and bladder

4  incontinence (A.R. at 20), and swollen hands and knees (A.R. at

5  21). He also expressly reviewed the subjective complaints to

6  which she testified, including weakness, tingling, swelling, and

7  numbness in her hands; balance problems and difficulty walking;

8  pain; frequent bowel movements; weakness; loss of hair, nausea,

9  and fatigue; swelling in her ankles; chest and arm pain;

10 worsening asthma; use of inhalers every two hours; and

11 tenderness, pain, muscle spasms, as well as pain in her lower

12 back that prompted recent use of a walker. (A.R. at 21-22.)

13      The ALJ expressly found that Plaintiff experienced some pain

14 that limited her from engaging in some physical activities (A.R.

15 at 17), but objective medical evidence contradicted the claimed

16 extent of her pain and symptoms (A.R. at 17-21). The lumbar

17 myelogram and CT were negative other than reflecting a low

18 termination of the lumbar thecal sac (A.R. at 18); and

19 examinations by Drs. Sharma, Gladen, and Stoltz revealed

20 tenderness, muscle spasms in the spine, some radicular signs, and

21 decreased forward flexion and range of motion of joints in the

22 upper and lower extremities, but an absence of joint swelling or

23 deformity, clubbing, cyanosis, edema, or ulceration, and the

24 presence of good tone, good active motion, normal muscle

25 strength, intact sensation, and normal reflexes and gait (A.R. at

26 17-19). Plaintiff's abdominal pain in May 2001 resolved with

27 treatment (A.R. at 19). Her upper right quadrant pain and

28 tenderness resolved after the cholecystectomy and hernia repairs

(A.R. at 18), and her left-sided chest pain was followed by negative chest x-rays, a stress cardiac study that showed no ischemia or functional abnormality, and a normal upper gastrointestinal endoscopy (A.R. at 18). The ALJ noted that Plaintiff's acute asthma resolved within hours when treated in the hospital, and that Plaintiff's Albuterol and Aerobid inhaler had been prescribed since 1999, which suggested good results (A.R. at 19). Plaintiff's claim of bowel frequency was not supported by the most recent objective evidence. (A.R. at 22.) Plaintiff herself described her symptoms to Dr. Stoltz in September 2000 as mild bowel incontinence, and throughout 2000 through 2002, she did not complain of incontinence or frequency. As to Plaintiff's claim of recently requiring a walker, the ALJ cited to an emergency medicine note that Plaintiff ambulated without assistance in October 2002. (A.R. at 20, 406.) As previously summarized at length, the medical evidence of record was consistent with the ALJ's conclusions in these respects.

Although the inconsistency of objective findings with subjective claims may not be the sole reason for rejecting subjective complaints of pain, Light v. Chater, 119 F.3d 789, 792 (9th Cir. 1997), it is one factor which may be considered with others, Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Morgan v. Commissioner 169 F.3d 595, 600 (9th Cir. 1999). It was appropriate for the ALJ to consider the lack of objective indicia of Plaintiff's impairments, including lack of objective clinical findings, use of conservative treatment, extent of efforts to obtain relief, and effectiveness of medications in controlling the symptoms. Soc. Sec. Ruling 96-7p and 20 C.F.R. §

416.929(c)(4)(1)(vii); <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th Cir. 1996); <u>Bunnell v. Sullivan</u>, 947 F.2d at 346 (9th Cir. 1991); <u>Kepler v. Chater</u>, 68 F.3d 387, 391 (10th Cir. 1995).

The ALJ also concluded that there were discrepancies in the record that cast doubt upon the credibility of Plaintiff. First, the ALJ focused on Plaintiff's statement made to Dr. Stoltz. The ALJ reasoned that Plaintiff had told Dr. Stoltz that she had suffered rheumatoid arthritis for the past nine years, and that it was confirmed by numerous x-rays, including a CT scan of her back, as well as blood tests; however, this was not consistent with the medical evidence described by the ALJ. (A.R. at 21-22.) The record supports this finding. To the extent that medical evidence is inconsistent, conflicting, or ambiguous, it is the responsibility of the ALJ to resolve any conflicts and ambiguity. <u>Morgan v. Commissioner</u>, 169 F.3d 595, 603 (9th Cir. 1999). Because the ALJ has authority to interpret ambiguous medical opinions, <u>Matthews v. Shalala</u>, 10 F.3d 678, 680 (9th Cir. 1993), the Court must defer to the ALJ's decision. The ALJ was entitled to interpret Dr. Bautista's diagnosis of arthritis because of an elevated sedimentation rate as inconclusive or uncertain; no test results supporting the diagnosis were in the record, and Dr. Bautista finally diagnosed joint and muscle pain and referred Plaintiff to a rheumatologist. (A.R. at 85, 88.) The ALJ had noted that Dr. Sharma expressly declined to diagnose RA without further testing. (A.R. at 18.) The ALJ noted that substantial test results showing negative or acceptable ANA, DNA, and rheumatoid factors appeared in the record; CT, myelogram, and x-ray findings did not support Plaintiff's statement to Dr. Stoltz;

and physical exams revealed no joint swelling, deformity, clubbing, or cyanosis. (A.R. at 21-22.) Further, he noted that in September 2002, Dr. Sablan no longer mentioned RA in his diagnosis. (Id. at 22.)

The ALJ then focused on the inconsistency between Plaintiff's claim of multiple subjective symptoms and the fact that when she reapplied for SSI in December 1999, she alleged RA as her only disabling impairment; further, in May 2001 in relaying her medical history, she did not mention RA and denied asthma, shortness of breath, or chest pain. (A.R. at 22.) Finally, she never testified to, or mentioned to any treating or examining physician, varicose veins as a disabling impairment. (Id.)

In this circuit, valid criteria for evaluating subjective complaints include weak objective support for claims and inconsistent reporting. Tidwell v. Apfel, 161 F.3d 599, 601-02 (9th Cir. 1998). Inconsistent statements are matters generally considered in evaluating credibility and are properly factored in evaluating the credibility of a claimant with respect to subjective complaints. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). The ALJ may consider whether the Plaintiff's testimony is believable or not. Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999). Included in the factors that an ALJ may consider are inconsistencies in the claimant's testimony or between the claimant's testimony and the claimant's conduct. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). Here, the ALJ appropriately relied on the inconsistencies, which were supported

39

by substantial evidence in the record.

The ALJ expressly concluded that with respect to Plaintiff's body pain and RA, Plaintiff had been prescribed medication for pain, but she was not taking medication that was normally given to rheumatoid arthritic individuals. (A.R. at 19.) This conclusion was supported by the opinion of Dr. Stoltz in September 2000; however, it was contradicted by the medications list of 2002, which listed Prednisone. (A.R. at 238.) Nevertheless, even without this factor, the record contains substantial evidence supporting the reasons noted hereinabove, which the Court concludes were clear, convincing, and sufficiently articulated for the Court to conclude that the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit Plaintiff's testimony. Although there might have been factors supporting Plaintiff's credibility, and even though one factor relied upon by the ALJ was not supported by the record, the ALJ nevertheless articulated clear and convincing reasons, supported by substantial evidence, for partially discrediting Plaintiff's subjective complaints of pain. Cf. Batson v. Commissioner of the Social Security Administration, 359 F.3d 1190, 1196 (9th Cir. 2004).

III. Listed Impairments

Plaintiff asserts that the evidence shows that Plaintiff has a combination of impairments which, in addition to obesity, "approach" several listings at step three. Plaintiff further asserts that the ALJ erred in not exploring any particular listings after a conversation with counsel about listings 1.02, 1.04, 4.11, 5.06, and 5.08. (Op. Brief at 9.) Plaintiff allots

two paragraphs, consisting of seven lines of text, to this
argument.

Plaintiff misconceives the nature of the review in which
this Court engages. It is not within the scope of substantial
evidence review to consider whether or not the evidence, if being
considered for the first time de novo, establishes or could
establish listed impairments. Rather, as previously set forth, it
is the function of this Court to determine whether or not the
ALJ's decision was made pursuant to correct legal standards, was
supported by substantial evidence, and contained legally adequate
findings.

It is Plaintiff's burden to establish that her impairment
met a listing. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).
Mere diagnosis of a listed impairment is not sufficient to
sustain a finding of disability; there must also be the findings
required in the listing. Young v. Sullivan, 911 F.2d 180, 183
(9th Cir. 1990); 20 C.F.R. § 416.925(d). Generally, specific
medical findings are needed to support the diagnosis and the
required level of severity. 20 C.F.R. §§ 404.1525(c)-(d),
416.925(c).

As to the adequacy of the ALJ's findings, the Commissioner
is not required to state why a claimant failed to satisfy every
different section of the listing of impairments; rather, it is
sufficient to evaluate the evidence upon which the ultimate
factual conclusions are based. Otherwise, an undue burden would
be put on the social security disability process. Gonzales v.
Sullivan, 914 F.2d 1197, 1200-01 (9th Cir. 1990).

The ALJ in the instant case reviewed the medical evidence of

record which supported the ALJ's findings that Plaintiff did not suffer from an impairment or combination of impairments that met or equaled a listing, including evidence that Plaintiff did not suffer from 1) major dysfunction of joints characterized by gross anatomical deformity (A.R. at 17, 20, 22; Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, No. 1.02); 2) disorders of the spine resulting in compromise of a nerve root or spinal cord with evidence of nerve root compression or lumbar spinal stenosis (A.R. at 18-20, 22; Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, No. 1.04); 3) chronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system (A.R. at 17, 18, 20; Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, No. 4.11); 4) chronic ulcerative or granulomatous colitis (demonstrated by endoscopy, barium enema, biopsy, or operative findings) with weight loss equal to that reflected in Listing 5.08 (A.R. at 18, 20, Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, No. 5.06); or 5) weight loss (such that weight is below Plaintiff's recorded weight for at least three months pursuant to § 5.08) due to any persisting gastrointestinal disorder (Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, No. 5.08).

Thus, the Court rejects Plaintiff's claim that the ALJ's findings were erroneous, insufficient, or unsupported.

IV. Treating Physician's Opinion

Plaintiff argues that the ALJ's rejection of Dr. Sablan's opinion was not supported by substantial evidence and a statement of adequate reasons, and that the ALJ failed to develop the

42

1  record to clarify Dr. Sablan's opinion.

2      An ALJ may disregard a treating physician's opinion that is

3  controverted by other opinions only by setting forth specific,

4  legitimate reasons for doing so that are based on substantial

5  evidence in the record. Rodriguez v. Bowen, 876 F.2d 759, 762

6  (9th Cir. 1989). This burden is met by stating a detailed and

7  thorough summary of the facts and conflicting clinical evidence,

8  stating the interpretation of the evidence, and making findings.

9  Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir 1986). However, if

10  the medical opinion of a claimant's treating physician is

11  uncontroverted, then an ALJ must present clear and convincing

12  specific reasons, supported by substantial evidence in the

13  record, for rejecting the uncontroverted medical opinion of a

14  claimant's treating physician. Holohan v. Massanari, 246 F.3d

15  1195, 1203 (9th Cir. 2001). A failure to set forth a reasoned

16  rationale for disregarding a particular treating physician's

17  findings is legal error. Cotton v. Bowen, 799 F.2d at 1408.

18      There is ample case law in this circuit regarding the

19  legitimacy of reasons cited for rejection of treating physicians'

20  opinions. It is established that the opinion of a treating

21  physician may be rejected if it is ambiguous and inconsistent or

22  conclusionary in form and not supported by clinical findings.

23  Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992);

24  Magallanes v. Bowen, 881 F.2d 747, 751. The fact that an opinion

25  is based primarily on the patient's subjective complaints may be

26  properly considered. Matney on Behalf of Matney v. Sullivan, 981

27  F.2d 1016, 1020 (9th Cir. 1992). It is permissible to rely on the

28  Plaintiff's statements or testimony regarding her impairments in

43

discrediting a treating physician's opinion. <u>Fisher v. Schweiker</u>, 568 F.Supp. 900, 903 (N.D.Cal. 1983). It is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion. <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432-33 (9th Cir. 1995); <u>Matney v. Sullivan</u>, 981 F.2d 1016, 1019 (9th Cir. 1992); <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989).

The ALJ rejected Dr. Sablan's opinion that Plaintiff had pedal edema, venous insufficiency, stool incontinence, RA based on increased sedimentation rate and positive titer, and swelling and synovial thickening in all of Plaintiff's joints. (A.R. at 20.)

The ALJ rejected Dr. Sablan's opinion that Plaintiff had disabling pedal edema and venous insufficiency, as well as stool incontinence, because it was inconsistent with Dr. Sablan's own clinic notes and was not accompanied by any active treatment for these ailments. (A.R. at 20.) The record supports this conclusion. Although Dr. Sablan noted in June 1998 swollen knees and +1 edema bilaterally with varicosities, mild edema of the knees in August 1998, +1 pedal edema in October 1998, and unspecified ½+ edema in December 1998, there was no accompanying diagnosis; in later years, Dr. Sablan's clinic notes did not indicate positive findings of pedal edema, varicosities, or venous insufficiency, or diagnoses thereof. There is no indication of any treatment for pedal edema or venous insufficiency. The record supports this clear and convincing reason for rejecting Dr. Sablan's opinion in this regard.

There is no mention of stool incontinence or frequency in Dr. Sablan's treatment notes. The ALJ also noted that the opinion of January 2000 regarding stool incontinence appeared to "be more of a projection of the difficulties that claimant might encounter as a result of her gastric bypass surgery." (Id.) The ALJ further noted that in September 2000, Plaintiff related some mild bowel and bladder incontinence that she had experienced for a while, but here was no indication that this had remained problematic. (Id.)

As to stool incontinence, Dr. Sablan's clinic notes do not reflect mention of this problem. The ALJ interpreted Dr. Sablan's responses to the questionnaire of January 18, 2000, as being as much a projection as a confirmation of Plaintiff's actual symptoms. (A.R. at 239-40.) To the extent that medical evidence is inconsistent, conflicting, or ambiguous, it is the responsibility of the ALJ to resolve any conflicts and ambiguity. Morgan v. Commissioner, 169 F.3d 595, 603 (9th Cir. 1999). Plaintiff herself characterized her bowel incontinence as mild in September 2000 (A.R. at 352-53), and she did not complain of it throughout her many instances of treatment for gastric complaints by other doctors and institutions in 2000, 2001, and 2002. The record supports the ALJ's reasoning that the stool incontinence was not shown to have continued to be a problem beyond the initial months after Plaintiff's gastric bypass surgery. The Court finds the ALJ's reasoning to be clear and convincing.

The ALJ rejected Dr. Sablan's opinion that Plaintiff had swelling and synovial thickening in all joints and RA due to increased sedimentation rate and positive titer because it was

45

inconsistent with the medical record in its entirety; he noted
Dr. Stoltz's findings. (A.R. at 20.) The record reflects a long
history of questionable diagnosis of RA. There are no tests to
support Dr. Bautista's initial diagnosis, although there is
reference to an elevated sedimentation rate; he later described
Plaintiff's ailment as arthralgias and anxiety, and referred her
to a rheumatologist. (A.R. at 85, 88.) Dr. Sablan sought to rule
out RA in June 1998, and tests were negative. (A.R. at 130, 134-
35, 138.) Dr. Sharma found no joint swelling or edema, noted the
lack of tests establishing ANA, DNA, or rheumatoid factor titers,
and concluded that RA would need to be confirmed with further lab
testing. Later in 1998, Dr. Dunklin concluded that if Plaintiff
had the gross limitation of movement as subjectively alleged from
RA, she would have joint distortion, which was lacking. Although
Dr. Sablan continued to diagnose RA in 1998 and 1999, her
sedimentation rate was only 22 in November 1999, and the record
does not reflect the elevated sed rates, positive RA titer, and
elevated CRP to which he referred in January 2000. (A.R. at 239-
40.) Normal test results were present in February and March 2000.
(A.R. at 257, 292-93.) By September 2000, Dr. Stoltz opined that
based on Plaintiff's asserted history of diagnosed RA for nine
years (which the ALJ rejected) and her morning stiffness,
Plaintiff could possibly have had some inflammatory arthritis,
but due to a complete absence of synovitis or joint inflammation,
and based on spinal tenderness and spasm and trigger points, he
diagnosed arthralgias. (A.R. at 352-57.) Dr. Khaira reported a
sed rate of 22 in November 2000. (A.R. at 377.) In February 2001,
Dr. Peery noted the lack of symptoms associated with arthritis.

1   (A.R. at 278-79.) In November 2001, Plaintiff reported that Dr.

2   Ibarra had told her to stay off RA medications; Dr. Sablan

3   diagnosed arthritis of uncertain type based on the previous

4   negative rheumatoid factor. (A.R. at 390-91.) Notes from the

5   Sablan clinic expressly indicate that seronegative RA would need

6   confirmation through a rheumatologist. (A.R. at 390-91.) Dr.

7   Dineson noted that Plaintiff's arthritis was being worked up.

8   (A.R. at 381-82.) Again, in December 2001, Sablan office notes

9   reflect a diagnosis of probably seronegative arthritis. (A.R. at

10  390.) Progress notes in 2002 indicate an equivocal diagnosis of

11  arthritis. (A.R. at 389.) No test results or other indicia

12  support Sablan's diagnoses in 2002 of RA, and tests in July 2002

13  including rheumatoid profile B, were all negative with the

14  exception of creatine kinase (A.R. at 387, 384-85, 394-95). In

15  September 2002, Sablan diagnosed Plaintiff's primary impairments

16  as low back pain, degenerative joint disease, and myositis; and

17  in February 2003, bilateral carpal tunnel syndrome and

18  polyarthritis. (A.R. at 660-63.)

19      In summary, the record supports the ALJ's conclusion that

20  the treating physician's opinion was not supported by the record

21  as a whole, which revealed normal or only slightly elevated

22  sedimentation rates, and a relatively consistent absence of joint

23  inflammation or deformity; further, it supports the ALJ's

24  reasoning that Plaintiff had not been referred to or routinely

25  treated by a rheumatologist. The ALJ stated legitimate and

26  specific reasons for rejecting the treating physician's opinion

27  that Plaintiff suffered disabling rheumatoid arthritis.

28      The ALJ rejected Dr. Sablan's opinion that Plaintiff was

incapacitated in August 1998 due to RA and swollen hands and knees because the period of incapacitation was two months only; further, Dr. Sablan had concluded that at that time, Plaintiff was able to care for her children, participate in part-time classroom training, and attend adult school part-time. The ALJ rejected Sablan's opinion that Plaintiff could not perform even sedentary labor because his progress notes for September 4, 1998, did not support the statement of limitations. (A.R. at 21.) Those notes reveal only a diagnosis of RA flare and bronchitis, and complaints of shortness of breath, tight chest, back pain, and body ache and tiredness. (A.R. at 122.) Where an expert's report identifies characteristics that might limit a claimant's ability to perform work on a sustained basis, if the report fails to explain how such characteristics preclude work activity in the claimant's case, it is appropriate and adequate for an ALJ to 1) determine that the level of impairment stated is unreasonable in light of the symptoms and other evidence in the record, and 2) set forth that analysis. See Morgan v. Commissioner of Social Security 169 F.3d 595, 601 (9th Cir. 1999).

The Court concludes that the ALJ articulated legally sufficient reasons, supported by substantial evidence in the record, for rejecting Dr. Sablan's opinions. Further, Plaintiff is incorrect in asserting that the Appeals Council had directed the ALJ not to reject the opinion. The Council merely directed the ALJ to obtain updated medical evidence from the treating source, consider treating and examining source opinions, and explain the weight given to them. (A.R. at 192.)

V. Development of the Record

48

As to the need to develop the medical record, it is the claimant's duty to prove that he or she is disabled. 42 U.S.C. § 423(d)(5) (noting an individual will not be considered disabled unless she furnishes medical and other evidence of disability); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001). However, the law imposes a duty on the ALJ to develop the record in some circumstances. 20 C.F.R. §§ 404.1512(d)-(f), 416.912(d)-(f) (recognizing a duty on the agency to develop a medical history, recontact medical sources, and arrange a consultative examination if the evidence received is inadequate for a determination of disability); Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983) (recognizing the ALJ's duty fully and fairly to develop the record even if the claimant is represented by counsel). The duty arises when the record before the ALJ is ambiguous or inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 262 F.3d 963, 968 (9th Cir. 2001).

Here, although there was reference to the need to confirm the RA diagnosis with testing, further testing took place, and the results were overwhelmingly negative. Plaintiff's own treating physician did not find it necessary to seek treatment for Plaintiff from a rheumatologist. Significant gastrointestinal testing occurred with negative results; there was no apparent need to conduct further testing. Pedal edema was not documented as a continuing symptom; thus, there does not appear to have been any need to pursue further opinions on the matter. As to obesity, Plaintiff argues that she was five feet four inches tall and 235 pounds. (Op. Br. at 7.) The record reflects, however, that by

July 1999, Plaintiff had lost sixty-one pounds and continued to lose weight. It does not appear that Plaintiff suffered the claimed obesity as an impairment for the requisite duration or that it continued at the time the ALJ formulated Plaintiff's RFC.

With respect to the use of a walker, the decision from the Appeals Council dated July 16, 2002, noted the early medical evidence that Plaintiff used a walker and directed the ALJ to consider evidence, formulate Plaintiff's RFC, and provide an appropriate rationale for it. (A.R. at 191-92.) Plaintiff argues that the record shows that she used a walker at the hearing because of pain in her lower back. (A.R. at 686.) As previously noted, the ALJ expressly rejected Plaintiff's subjective claim and cited to medical evidence from the month of the hearing that supported his conclusion.

In summary, the ALJ did not err in failing to develop the record regarding Plaintiff's medical condition.

VI. <u>Plaintiff's RFC</u>

Plaintiff challenges the RFC, arguing that the ALJ failed to consider the medically determinable impairment of bowel frequency and incontinence, as well as venous insufficiency and edema, anemia, hernia repair, colecystitis, and marked macrovesicular steatosis on liver biopsy; failed to consider all combined impairments; failed to explain Dr. Stoltz's and/or Dr. Sharma's standing/walking restrictions to six our of eight hours; and did not properly consider Plaintiff's seronegative arthritis and polyarthralgia.

Social Security regulations define residual functional capacity as the "maximum degree to which the individual retains

the capacity for sustained performance of the physical-mental requirements of jobs." <u>Reddick v. Chater</u>, 157 F.3d 715, 724 (9th Cir. 1998) (citing 20 C.F.R. 404, Subpt. P, App. 2 § 200.00(c) and <u>Lester v. Chater</u>, 81 F.3d 821, 833 (9th Cir. 1995)). The Commissioner must evaluate the claimant's "ability to work on a sustained basis." <u>Id.</u> (citing 20 C.F.R. § 404.1512(a)); <u>Lester</u>, 81 F.3d at 833); <u>see</u> 20 C.F.R. § 416.945. In assessing a claimant's RFC, it is necessary to consider the limiting effects of all the claimants impairments, even those that are not severe. 20 C.F.R. § 404.1545(a), (e); 20 C.F.R. § 416.945(a), (e); Soc. Sec. Ruling 96-8p at 4; <u>Reddick v. Chater</u>, 157 F. 3d 715, 724 (9th Cir. 1998). Under Ninth Circuit law, the ALJ must consider all factors that might have a significant impact on an individual's ability to work. <u>Erickson v. Shalala</u>, 9 F.3d 813, 817 (9th Cir.1993) (citing <u>Varney v. Secretary of HHS</u>, 846 F.2d 581, 585 (9th Cir. 1987)).

The ALJ rejected Dr. Sablan's opinion that Plaintiff had pedal edema, venous insufficiency, stool incontinence, RA based on increased sedimentation rate and positive titer, and swelling and synovial thickening in all of Plaintiff's joints. (A.R. at 20.) As previously discussed, these findings were accompanied by the ALJ's statement of adequate reasons that were supported by substantial evidence in the record. Thus, the ALJ was not required to incorporate them in Plaintiff's RFC.

The ALJ found that Plaintiff suffered severe impairments, including generalized body aches and joint pain, rule out rheumatoid arthritis; status post gastric by pass surgery for morbid obesity; acute cholecystitis and umbilical and ventral

hernias status post open cholecystectomy and repair of hernias; and asthma. Further she suffered nonsevere episodic abdominal pain. (A.R. at 17.) As to the hernia repair and cholecystitis, there is no evidence that these phenomena were experienced other than as passing side-effects from surgery, and there is no evidence that they affected Plaintiff's ability to work. With respect to the marked macrovesicular steatosis on liver biopsy, there is no evidence that Plaintiff suffered any effects from this condition, which was noted only in connection with the November 1998 analysis of the sample from the cholecystectomy.

The ALJ figured Plaintiff's asthma into the RFC analysis; he rejected Plaintiff's subjective claims as to its severity and noted the effectiveness of treatment, and he reasoned that visits to the emergency room had resolved her symptoms. (A.R. at 19, 22-23.) He rejected Dr. Sablan's opinion of disability based on a lack findings. He expressly put weight on the opinions of the state agency physicians, who noted the need to avoid pulmonary irritants, and he limited her RFC with a provision for avoidance of excessive pulmonary irritants. (A.R. at 22.)

As to the body aches and pains, as previously detailed, the ALJ properly rejected Dr. Sablan's opinion regarding Plaintiff's being disabled by RA. The ALJ expressly noted that Plaintiff's obesity, logically a factor that would have exacerbated her body aches and pains, had ceased. (A.R. at 22.)[3] He relied upon the reports of Drs. Stoltz and Sharma and the state agency consultants in concluding that Plaintiff's back and joint pain

---

[3] The Court further notes that there is no evidence that obesity limited Plaintiff's ability to work.

were such that she could perform light work. He correctly noted that there was no diagnosis in the record of fibromyalgia, (A.R. at 23); Dr. Sharma posited it as a possible diagnosis, but was not conclusive, (A.R. at 94). Dr. Sharma had not been able to complete all mobility tests, but she had opined lifting capacity consistent with light work with unspecified limits in standing and walking. (Id.) Dr. Stoltz, a specialist in internal medicine, opined that Plaintiff could lift and carry loads consistent with light work, stand and walk six hours out of eight with regular breaks, and sit without limitation. (A.R. at 352-57.) Likewise, the RFC assessments of consultants Drs. Dunklin, Holmes, Mitts, and Peery were for light work.

However, Drs. Mitts and Peery posited some postural limitations due to her muscle spasms and spinal tenderness (A.R. at 140-49, 139, 358-67, 278-79.) The ALJ erred in not explaining why he rejected the postural limitations imposed by the state agency physicians, Drs. Mitts and Peery, upon whom the ALJ relied, and who themselves purported to rely on the findings of Dr. Stolz, upon whom the ALJ relied. The ALJ noted Dr. Stoltz's and Dr. Sharma's findings of spinal tenderness and decreased range of motion, but he did not state reasons for rejecting the postural limitations imposed by the state agency physicians who relied on those findings, and whose assessments the ALJ found to be consistent with the clinical and x-ray findings of record. In this respect, the ALJ failed to discuss his rejection of significant evidence. His statement that there was a failure of proof and a lack of objective findings to substantiate a more restricted functional assessment (A.R. at 23) was directed to a

53

diagnosis of fibromyalgia, not to limitations imposed on the basis of arthralgia and other clinical findings that the ALJ had apparently weighed heavily.

Further, with respect to anemia, the medical record reflects continuing symptoms from 2000 through 2002. Plaintiff testified that she was weakened severely by her anemia. Dr. Peery's RFC noted no repeated transfusions, but Dr. Dineson later opined that Plaintiff's anemia rendered her extremely weak and dizzy with poor ability to concentrate. This impairment appeared as a matter of record, and medical opinion suggested that the condition contributed to the Plaintiff's inability to perform work. The ALJ did not figure this impairment into the RFC or state any reasons for determining the weight to be given the pertinent opinions. This was error.

In this connection, the Court further notes that the ALJ failed to consider the treating physician's opinion that Plaintiff's carpal tunnel syndrome resulted in restrictions of the use of her hands, and to make findings regarding Plaintiff's subjective claims regarding her hands and her wearing of hand braces. (A.R. at 660-663, 672-73.) Upon remand, the ALJ will have an opportunity to address this matter.

It is uncertain how the competing and conflicting opinions should be weighed, and what reasons might be given for the relevant determinations regarding Plaintiff's RFC. The matter will be remanded to permit the ALJ to consider the matters omitted from his consideration of Plaintiff's subjective complaints and his RFC determination, to make legally adequate findings thereon, to conclude as to Plaintiff's RFC, to complete

1  the analysis at steps four and five, and to engage in all further
2  proceedings necessary to complete the analysis.

3      VII. <u>Vocational Expert</u>

4      Plaintiff argues that the ALJ erred in failing to use a VE
5  to determine that Plaintiff could perform her past relevant work
6  as a cashier as described in a specific position numbered in the
7  DOT. Because the matter is being remanded for the ALJ to
8  reconsider Plaintiff's RFC, this issue is potentially moot. Upon
9  remand the ALJ must look at the residual functional capacity and
10 the physical and mental demands of the claimant's past relevant
11 work. 20 C.F.R. §§ 404.1520(e) and 416.920(e) The claimant must
12 be able to perform the actual functional demands and job duties
13 of a particular past relevant job, or the functional demands and
14 job duties of the occupation as generally required by employers
15 throughout the national economy. Soc. Sec. Ruling 82-61. This
16 requires specific findings as to the claimant's residual
17 functional capacity, the physical and mental demands of the past
18 relevant work, and the relation of the residual functional
19 capacity to the past work. Soc. Sec. Ruling 82-62; <u>Pinto v.</u>
20 <u>Massanari</u>, 249 F.3d 840, 844-45 (9th Cir. 2001). The ALJ is
21 directed to make adequate findings regarding the relation of the
22 residual functional capacity to the past work, which in turn
23 requires fully investigating the demands of Plaintiff's past work
24 and addressing any evidence in the record that may suggest that
25 the position/s did not fall within the category of light duty or
26 within any limitations that the ALJ finds restrict Plaintiff's
27 RFC.

28                      <u>DISPOSITION</u>

A district court is authorized to affirm, modify, or reverse a decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g). The decision whether to remand a matter pursuant to sentence four of § 405(g) or to order immediate payment of benefits is within the discretion of the district court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000). When a court reverses an administrative agency determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (citing INS v. Ventura, 537 U.S. 12, 16 (2002)). It is not necessary to order an award of benefits. Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003). Generally, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed. Varney v. Secretary of Health and Human Services, 859 F.2d 1396, 1399 (9th Cir. 1988).

Because additional issues remain to be addressed, and further because it is not clear that an award of benefits to Plaintiff should result after the additional issues are addressed on remand, the Court will order the matter remanded for further consideration of the evidence and entering of all necessary and appropriate findings with respect to the applications for DIB and SSI pending before the Court.

DISPOSITION

Based on the foregoing, the Court concludes that the ALJ's decision was not supported by substantial evidence in the record

1   as a whole and was not based on proper legal standards.

2

3           Accordingly, it IS ORDERED that

4           1. Plaintiff's social security complaint IS GRANTED in part,

5   and

6           2. The matter IS REMANDED pursuant to sentence four of 42

7   U.S.C. § 405(g) for further consideration, consistent with this

8   decision, of Plaintiff's status as disabled, to permit the ALJ to

9   consider the matters omitted from his consideration of

10  Plaintiff's subjective complaints and his RFC determination, to

11  make legally adequate findings thereon, to conclude as to

12  Plaintiff's RFC, to complete the analysis at steps four and five,

13  and to engage in all further proceedings necessary to complete

14  the analysis of whether or not Plaintiff was disabled; and

15          3. Judgment BE ENTERED for Plaintiff Paula Andrade and

16  against Defendant Jo Anne B. Barnhart.

17

18                              IT IS SO ORDERED.

19  **Dated:    September 21, 2005    **          **/s/ Sandra M. Snyder**
20  icido3                              UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28